IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SCOTT BRUCE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>SUNTECH POWER HOLDINGS CO. LTD., ZHENGRONG SHI, DAVID KING, JULIAN RALPH WORLEY, AMY YI ZHANG AND DAVID HOGG,<br><br>Defendants. | No. CV 12-04061 RS<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND** |

## I. INTRODUCTION

This shareholders' putative class action arises from a steep decline in the share price of Suntech Power Holding Co. Ltd. ("Suntech") after the company disclosed it may have been the victim of a fraud. Plaintiffs allege defendant Suntech and individual defendants Zhengrong Shi, David King, and Amy Yi Zhang (Suntech's CEO, CFO, and former CFO, respectively) knew or should have known that €560 in German government bonds pledged by a third party as part of a loan guarantee extended by Suntech did not exist and therefore the company and its executives made material misrepresentations about the extent of Suntech's liabilities during the class period.

Defendants Suntech, Shi, and King[1] brought motions to dismiss under Federal Rule of Civil Procedure 12(b). On October 21, 2013, defendant Suntech filed a notice of an involuntary petition for bankruptcy resulting in an automatic stay under 11 U.S.C. § 362. Individual defendants Shi and King are not subject to the automatic stay; this order concerns their individual motions to dismiss as well as those arguments set forth by the corporation in which they join. Because the factual allegations are insufficient to support a claim under the applicable standards of pleading, defendants' motions to dismiss will be granted, with leave to amend. Pursuant to Civil Local Rule 7-1(b), defendants' motions to dismiss (ECF Nos. 76 and 78) are suitable for disposition without oral argument, and the hearing set for January 23, 2014, is vacated.

## II. BACKGROUND

The Consolidated Amended Class Action Complaint (hereinafter CAC), the factual averments of which must be taken as true for purposes of this motion, set forth the following scenario. Suntech is a solar energy company based in China and incorporated in the Cayman Islands. Suntech designs, manufactures, and markets photovoltaic products used to provide electric power for residential, commercial, industrial, and public utility customers in Europe, North America, the Middle East, Australia, and Asia. In 2008, Suntech formed the Global Solar Fund, S.C.A., Sicar ("GSF") to invest in private companies that own or develop solar energy projects. In May 2010, Suntech entered into a €554.2 million guarantee of a loan granted by the China Development Bank to GSF's largest investee company. As further security, Suntech was required to maintain approximately €30.0 million in a cash collateral account. Collectively, these two amounts are referenced herein as the "Loan Guarantee." As Suntech later explained in response to an SEC inquiry, Suntech received a pledge of €560 in German government bonds from GSF Capital Pte Ltd (GSF Capital), the parent of the general partner of GSF, as security for the Loan Guarantee. In light of this pledge, Suntech stated that the fair value of the Loan Guarantee liability was approximately €2 million.

On July 30, 2012, Suntech announced that it may have been the victim of fraud in connection with GSF Capital's pledge of German government bonds as security for the Loan

---

[1] Individual defendant Amy Yi Zhang has not yet been served in this action and does not join the instant motion to dismiss.

Guarantee. Suntech's outside counsel found evidence that the documentation regarding GSF's German bond pledge "may have been fabricated." According to Shi, "Full investigation made it apparent that these bonds may never have existed and that GSF Capital and its principal may have committed fraud." King added that Suntech was informed in 2010 that GSF Capital did not own the bonds in question but had borrowed them from another registered company in Europe. On this news, shares of Suntech declined $0.23 per share, or 14.65%, to close on July 30, 2012, at $1.34 per share, on unusually heavy volume, and further declined, with similar heavy trading, another $0.21, or 15.67%, to close at $1.13 per share on July 31, 2012. Suntech's convertible notes declined from $69.00 just prior to the disclosure to $45.00 at the close of trading on July 31, 2012, a drop of nearly 35%, on heavy volume. Suntech later clarified that the security interest pledged by GSF Capital did not in fact exist, that Suntech accordingly had been the victim of fraud, and that the company would therefore revise its valuation of its liability for the Loan Guarantee from €2 million to between $60 million and $80 million, with a corresponding reduction in net income for the year ended. Based on these events, plaintiffs initiated this suit for violation of the Securities and Exchange Act of 1934.

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations" are not required, a complaint must include sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 US 544, 555, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Claims grounded in fraud are also subject to Rule 9(b), which provides: "In allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy that rule, a plaintiff must allege the "who, what, where, when, and how" of the charged misconduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. See *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based either

on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *See Twombly*, 550 US at 555. "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 US at 555) ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not taken as true). In actions governed by the Private Securities Litigation Reform Act ("PSLRA"), such as this one, these general standards are subject to further refinement, as discussed in more detail below.

## IV. DISCUSSION

A. Count I—Section 10(b) of the Exchange Act

Section 10(b) of the Exchange Act makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Pursuant to Section 10(b), the Securities and Exchange Commission ("SEC") has promulgated Rule 10b-5, which provides, *inter alia*, "It shall be unlawful for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(c).

To establish a violation of Rule 10b-5, a plaintiff must demonstrate "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Systems, Inc. Securities Litigation*, 411 F.3d 1006, 1014 (9th Cir. 2005). To survive a motion to dismiss, a complaint asserting claims under Section 10(b) and Rule 10b-5 must satisfy the dual pleading

requirements of Rule 9(b) and the PSLRA. *Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

### 1. Falsity

A false or misleading statement is an essential element of any cause of action for securities fraud. *See Stoneridge Investment Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). Under the PSLRA, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . state with particularity all facts on which that belief is formed." 15 U.S.C. 78u-4(b)(1). In this case, plaintiffs challenge as false or misleading Suntech's (a) disclosures about the adequacy of its internal and financial controls, (b) opinions about the fair value of, and likelihood of risk associated with, the liability on the Loan Guarantee, and (c) statements about GSF prior to the filing of Suntech's 2010 20-F on May 9, 2011.

#### a. Financial controls

Plaintiffs first allege that Suntech failed to disclose that the company lacked internal and financial controls regarding the verification, valuation and reporting of material liabilities, based on Suntech's failure to detect (prior to July 2012) that it had been deceived about the existence of the German government bonds. According to plaintiffs, this omission resulted in materially misleading statements in its 2010 and 2011 annual reports (CAC, ¶¶ 93–95, 108–110) and in press releases issued August 18, 2010 (*id.* ¶ 69) and November 21, 2010 (*id.* ¶ 78).

Suntech filed its Annual Report for the 2010 fiscal year on Form 20-F with the SEC ("2010 Form 20-F") in May 2011. Shi signed the Company's 2010 Form 20-F, which included standard Sarbanes-Oxley certifications signed by Shi and Zhang. The following year, Suntech filed its Annual Report for the 2011 fiscal year ("2011 Form 20-F") with similar certifications signed by Shi and King. According to plaintiffs, these statements concerning the company's financial controls were materially false when made because the statements: (1) did not disclose the Company's failure to comply with Generally Accepted Accounting Procedures (GAAP), because the statements did not reflect the fair value of the Loan Guarantee; and (2) did not disclose the Company's failure to design or implement effective disclosure or internal controls sufficient to detect the fraud later uncovered.

Similarly, plaintiffs claim press releases issued August 19, 2011 (reporting second quarter 2010 financial results) and November 17, 2010 (reporting third quarter 2010 financial results) failed to disclose that the company lacked the internal and financial reporting controls necessary to determine its outstanding liabilities.

Allegations of a failure to comply with GAAP, without more, are not actionable under the PSLRA. See *Daou*, 411 F.3d at 1018 ("although overstatement of revenues in violation of GAAP may support a plaintiff's claim of fraud, the plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position"). In this case, plaintiffs' allegation that the company undervalued the Loan Guarantee according to GAAP rests solely on the later-discovered fraud; plaintiffs make no allegation that the valuation was otherwise false at the time based on the information available to the company. Nor do they allege that any accounting irregularities—as opposed to the fact and subsequent disclosure of fraud—contributed to their loss.

Plaintiffs also point to the later-discovered fraud to show that the company lacked sufficient financial controls at the time of these statements. Again, this is not enough to establish an intentional misstatement. As the Seventh Circuit explained in dismissing similar claims, "[B]y definition, *all* frauds demonstrate the 'inadequacy' of existing controls, just as all bank robberies demonstrate the failure of bank security and all burglaries demonstrate the failure of locks and alarm systems." *Higginbotham v. Baxter Intern., Inc.*, 495 F.3d 753, 760 (2007); see also *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 801 (N.D. Ill. 2007) ("An allegation that defendants should have known about internal control deficiencies based on nothing more than later acknowledgment of such weaknesses amounts to pleading fraud by hindsight.").

### b. Fair valuation

Plaintiffs next challenge Suntech's fair value assessment of the liability associated with the Loan Guarantee as reported in various statements throughout the class period. (See CAC ¶¶ 69, 71, 75, 78, 82, 85, 87, 97, 99, 100–101, 103, 104, 105–106, 112.) Plaintiffs offer certain statements by the company valuing the Loan Guarantee liability as approximately €2 million, a liability the company later restated upon learning the German bonds pledged as security by GSF did not exist.

According to plaintiffs, these statements were false at the time they were made because Suntech (1) understated the liability on the basis of a security that did not exist; (2) lacked any reasonable basis to believe its stated valuation because it failed to engage in proper due diligence; and (3) failed to disclose that GSF claimed only to have a possessory and not ownership interest in the bonds pledged as security. With regards to the quantitative valuation, plaintiffs offer no factual averments that statements regarding the valuation were false at the time they were made. Nor do plaintiffs offer any specific allegations as to the inadequacy of the company's due diligence other than the fact of the later-discovered fraud.

Granted, Suntech's alleged failure to disclose that GSF claimed only a possessory not ownership interest in the security specifically alleges a material omission. In the securities context, an omitted fact is material if there is a substantial likelihood that a reasonable investor would have viewed the disclosure as "significantly alter[ing] the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (internal quotation marks and citation omitted). Disclosure is necessary if, under the circumstances, omitting the material information would render a company's statement misleading. *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321–22 (2011). In this case, Suntech's failure to disclose the limits of GSF's interest in the bonds arguably rendered misleading Suntech's repeated statements that "[g]iven the Company has the ability to access the German Government Bonds without any restriction in the event of default of the investee companies, the Company believes that the likelihood that it will have to satisfy its guarantee, without being immediately compensated under the German Government Bonds, is remote." (Complaint, ¶ 17 (quoting Suntech, Ltr. to SEC, Dec. 29, 2010); see also Fortinsky Decl., Ex A, at p. F-48 (2010 Form 20-F, filed with the SEC on May 9, 2011).

   c. *Failure to Disclose the GSF Loan Guarantee*

In addition to Suntech's failure to disclose deficiencies as to the backstop collateral underlying the Loan Guarantee, plaintiffs allege defendants' failure to disclose details about the Loan Guarantee itself before Suntech's 2010 20-F filing on May 9, 2011, constitutes a material omission. In particular, plaintiffs suggest Suntech's statements about GSF on June 3, 2010, August 18, 2010, and November 17, 2010 were false and misleading in the absence of specific disclosures

about the Loan Guarantee. (CAC ¶¶ 65, 67, 69, 71, 73, 78, 90, 89, 91.) Defendants do not contest that, given the size of the loan guarantee, there is a substantial likelihood that a reasonable investor would have viewed the disclosure as "significantly alter[ing] the 'total mix' of information made available." *Basic Inc.*, 485 U.S. at 231–32 (internal quotation marks and citation omitted).

### d. Attribution of Statements to King

King correctly argues that he cannot be liable for any false or misleading statement he did not make. *See City of Royal Oak Retirement System v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1070 (N.D. Cal. 2012) ("[a] defendant can be held liable under § 10(b) for a false or misleading statement only if the defendant 'made' the statement."). He certainly cannot be liable for any misstatements made before he joined Suntech as its CFO in May 2011. (See CAC ¶¶ 1, 13, 31.) Plaintiffs only directly attribute two statements to King: (1) a statement he made during the July 30, 2012 conference call in which the Company disclosed the suspected fraud (*id.* ¶ 116), which is not alleged to be false or misleading; and (2) the Sarbanes-Oxley certification, signed by King, in Suntech's 2011 Form 20-F (id. ¶¶ 31, 108). As discussed above, the later statement is not actionable as the failure to detect fraud does not itself render false standard certifications about the adequacy of internal controls.

To the extent plaintiffs seek to hold King liable for other statements by Suntech or Shi on the basis of his position as CFO, the conclusory allegations that he "had the authority to and did control the making of [those] statements" "by virtue of [his] responsibilities and activities as . . . Chief Financial Officer" lack the requisite specificity. *Cf. In re Immersion Corp. Sec. Litig.*, No. 9-4073, 2011 WL 871650, at *3 (N.D. Cal. Mar. 11, 2011) (rejecting as conclusory allegations that corporate officer defendants "controlled and/or possessed the authority to control the contents of [the company's] reports, press releases and presentations to securities analysts and through them, to the investing public"); *see also Lapiner v. Camtek, Ltd.*, No. 8-1327, 2011 WL 445849, at *3 (N.D. Cal. Feb. 2, 2011) (declining to attribute corporate statements to individual defendants because "the majority of district courts within the Ninth Circuit[] have concluded that group pleading is no longer viable under the PSLRA") (internal citation omitted).

### 2. Scienter

While plaintiffs have to some extent identified material misrepresentations and omissions of fact, the PSLRA includes the additional requirement that a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Under the law of this circuit, to state a claim for an alleged violation of Section 10(b), a complaint "must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Daou*, 411 F.3d 1006, 1015 (9th Cir. 2005) (citing *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999)). "Reckless conduct may be defined as a highly unreasonable omission, involving . . . an extreme departure from the standards of ordinary care . . . that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012) (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990)). "Recklessly turning a 'blind eye' to impropriety is equally as culpable as [actual knowledge or intent] under Rule 10b-5." *Id.* at 708.

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Supreme Court held that a "strong inference" of scienter was found "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. As recounted in *Tellabs*, the PSLRA adopted the "strong inference" requirement from then-existing Second Circuit case authority that had imposed it "to ward off allegations of 'fraud by hindsight.'" *Id.* at 320 (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2nd Cir. 1994) and *Denny v. Barber*, 576 F.2d 465, 470 (2nd Cir. 1978).

Plaintiffs aver that defendants were at least deliberately reckless in their failure to verify the existence of the German bonds or "meaningfully [to review] the documentation regarding the purported German government bonds" in light of a number of "red flags." As plaintiffs explain in their opposition to this motion, "This case is not about Defendants' decision not to verify the phantom collateral claimed by a known liar—a decision that nobody would characterize as 'good.' Rather, it is about Defendants' concealment from investors that the collateral had not been verified, and its misrepresentations that the collateral existed." (Response at 16 n.11.) Plaintiffs correctly

observe, "That these material misrepresentations overlap an unmistakably terrible business decision does not render them inactionable." (*Id.*)

Nevertheless, as currently alleged, plaintiffs' complaint rests too heavily on the ultimate absence of the bonds to imply that any due diligence was insufficient—the type of "fraud by hindsight" allegation rejected by *Tellabs*. For example, plaintiffs aver that defendants "undertook no due diligence whatsoever to confirm that the collateral pledged under the loan guarantee actually existed." (Response at 10.) Plaintiffs continue, "In light of their deliberate decision not to verify the collateral Romero was supposed to deliver or examine the documents provided by Romero, Defendants' claims that the truth was "actively concealed" from them make no sense." (*Id.*) However, at present, this allegation is based on Suntech's post-class period revelation that the documentation from GSF "contained irregularities suggesting fraud" (CAC ¶ 9; see also ¶¶ 77, 84, 86, 98, 107, 111 (alleging that statements by Suntech "omitted that documentation provided by GSF Capital Pte Ltd., on its face, contained irregularities, but that Defendants either failed to meaningfully review such documentation or ignored the irregularities").) Although the later-disclosed fraud and admitted irregularities do suggest an absence of due diligence, it is equally plausible based on the CAC to infer that Suntech was the victim of fraud despite its best efforts to verify the existence of the pledged security.

Plaintiffs point to a series of "red flags" to allege that defendants "recklessly failed to even ascertain the existence of such bonds or confirm that they would be available to backstop Suntech's obligations under the GSF Loan Guarantee." (CAC ¶¶ 132, 134–35.) None of these so-called red flags, viewed individually or together, suffices to show defendants acted with "deliberate recklessness."

Specifically, plaintiffs fail to allege how defendants' knowledge that the owner of GSF Capital misrepresented his job title and affiliation with Suntech on at least one occasion would have any bearing on their assessment as to the risk and valuation of the Loan Guarantee. Nor do plaintiffs offer anything other than a hindsight assertion that defendants lacked a reasonable basis to believe that GSF Capital or its owner personally had the ability to procure €560 million in German government bonds. Statements from a private equity fund manager, reported in August 2012 after

the close of the class period, say nothing about what the defendants knew—or even what they should have known—at the time of the alleged misstatements. Disclosure by the company of an Italian investigation into the permitting process for certain GSF projects is a "concession" only of accusations not of any improper behavior. *Cf. Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007) ( "Accusations differ from proof; business executives are not charged with 'knowing' the truth of whatever any public official anywhere in the world may assert.").

As to the structure of the Loan Guarantee, plaintiffs offer only an August 2012 Reuters article, postdating the class period, in which a financial analyst is quoted raising questions about why a third party would be willing to lend €560 million in bonds to GSF Capital. Plaintiffs make no specific allegations that the structure of the deal itself should have given rise to the requisite scienter during the class period.

Plaintiffs' allegations based on Suntech's failure to verify the collateral are even weaker as to King, who joined Suntech approximately one year after the Loan Guarantee was consummated. Plaintiffs' non-specific allegations that King's position as CFO gave him "access to material non-public information" about the true value and nature of the Loan Guarantee are insufficient to show fraudulent intent. See *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008) ("As this court has noted on more than one occasion, corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud.") Nor does his signature on the Sarbanes-Oxley certification in Suntech's 2011 20-F satisfy plaintiffs' burden. *See Zucco Partners*, 552 F.3d at 1003–04 ("required certifications under Sarbanes-Oxley Section 302(a) . . . add nothing substantial to the scienter calculus.")

*3. Loss Causation*

As recounted above (and putting aside the deficit in the scienter averments just addressed), plaintiffs have sufficiently alleged the following material omissions: defendants' failure to disclose the existence and details of the Loan Guarantee prior to Suntech's 2010 20-F filing on May 9, 2011, and their failure to disclose that GSF claimed only a possessory not ownership interest in the

security pledged to back the Loan Guarantee. Yet, also lacking is any adequate averments relative to loss causation with respect to either misrepresentation.

Loss causation is the "causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Correlation is not enough: "So long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud. Enabling a plaintiff to proceed on such a theory would effectively resurrect what *Dura* discredited—that loss causation is established through an allegation that a stock was purchased at an inflated price." *Metzler Inv. GMBH*, 540 F.3d at 1064.

Plaintiffs' alleged economic loss occurred after Suntech disclosed on July 30, 2012, that the German bonds pledged to backstop the Loan Guarantee did not exist. Although this was the first time defendants acknowledged the missing bonds, Suntech previously disclosed the details of the Loan Guarantee and the intended German bond backstop in Suntech's 2010 20-F filing on May 9, 2011.[2] According to plaintiffs, this statement was materially false when made because Suntech did not disclose that (1) the fair value of the liability was at least $60 to $80 million; (2) the pledged €560 million in German government bonds did not exist; (3) it had not conducted meaningful due diligence with respect to the pledge agreement; (4) the bonds in question were borrowed by GSF Capital from third parties; and (5) the documentation provided by GSF Capital contained irregularities ignored or undetected by Suntech through a lack of due diligence. (*See* CAC ¶ 98.) As discussed above, allegations resting on the later-disclosed fraud, without more, do not meet the PSLRA pleading standard. Setting this issue aside, Suntech's 2010 20-F publicly disclosed the existence and structure of the loan guarantee, with the exception of the ownership of the bonds.

---

[2] "In May 2010, we consummated an arrangement in which we guaranteed payment obligations under finance facilities provided by China Development Bank to Solar Puglia II, S.ar.L, an investee company of GSF, amounting to approximately € 554.2 million. In addition, as additional security to China Development Bank, we are required to maintain cash collateral accounts with a commercial bank in Luxembourg in an amount equal to one installment payment of amounts due under the finance facilities amounting to approximately € 30.0 million. . . . As security for our obligations under the guarantee, we received a pledge of € 560.0 million in German government bonds from GSF Capital Pte Ltd., the parent of the general partner of GSF. The fair value of the debt guarantee was approximately € 2.0 million, which has been recorded in our balance sheet at the effective date of this guarantee." (CAC ¶ 97.)

Because plaintiffs do not allege any economic loss as a result of the May 2011 filing, their claim necessarily fails to the extent it rests on the company's failure to disclose the existence of the Loan Guarantee in a timely fashion.

As to defendants' failure to disclose that GSF held only a possessory interest—if any—in the pledged security, the pleadings do not show that any economic loss flowed from that omission. Suntech disclosed this detail for the first time on July 30, 2012, during the same announcement that the bonds did not, in fact, exist. Although plaintiffs' alleged economic loss followed that disclosure, plaintiffs' economic loss is far more plausibly attributed to the disclosure that the bonds were missing and, in fact, may never have existed.

In sum, the only economic loss alleged by plaintiffs is most plausibly attributed to defendants' disclosure that the bonds did not exist. Because plaintiffs have not sufficiently pleaded the requisite scienter as to those statements, plaintiffs' claims must be dismissed.

D. <u>Standing</u>

Plaintiffs purport to represent a class consisting of purchasers of all Suntech securities traded in the United States, including Suntech ADSs and Suntech 3.0% convertible notes. (CAC ¶¶ 1, 120–27.) However, none of the plaintiffs claim to have purchased any of Suntech's convertible notes at any time during the class period. (*See* CAC ¶ 28.)

The Ninth Circuit has not provided guidance on this issue, but a prior case from this court held that "[p]laintiffs with a valid securities claim may represent the interests of purchasers of other types of securities in a class action where the alleged harm stems from the same allegedly improper conduct." *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1052 (N.D. Cal. 2008). In this case, plaintiffs' allegations rest on purported statements and omissions made by defendants and would appear to be common to all purported class members based on this complaint. Accordingly, the CAC is not subject to dismissal on standing grounds to the extent it advances claims held by bondholders.

F.. <u>Section 20(a) Claims</u>

Finally, individual defendants Shi and King seek dismissal of the 20(a) claims asserting individual liability under the Exchange Act by virtue of their high-level positions as Chief Executive

Officer and Chief Financial Officer of the company. In order to maintain a Section 20(a) claim, a plaintiff must show a primary violation of Section 10(b). *See Zucco Partners*, 552 F.3d at 990. As plaintiffs fail to plead a Section 10(b) violation, their Section 20(a) claims against Shi and King must similarly be dismissed. *See Zucco Partners*, 552 F.3d at 990.

In the event that any amended Section 10(b) claims ultimately survive as to Zhi and King, then the question of 20(a) liability turns on the sufficiency of plaintiffs' allegations that the individual defendants exercised actual power or control over the misrepresentations. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). At the pleading stage, a plaintiff need only demonstrate that the defendant had the authority to exercise actual power, not the exercise itself. *Id.* Scienter is not an element of control person liability; instead, a defendant may raise good faith as an affirmative defense. *Id.*

As the former CEO of Suntech, Shi does not contest that he is a control person within the meaning of Section 20(a) but only that plaintiffs have not shown any underlying 10(b) violation. Accordingly, to the extent plaintiffs' 10(b) claim ultimately survives, their 20(a) claim as to Shi would survive as well.

King, on the other hand, argues that the sole basis of plaintiffs' allegation that he had power and control over Suntech's statements regarding the Loan Guarantee is his position as Suntech's CFO—a position he assumed only in May 2010, approximately a year after the Loan Guarantee was consummated and almost a year into the alleged class period. To the extent plaintiffs allege actionable statements by Suntech during the period before King's employ as CFO, he cannot be held liable under Section 20(a).

As to allegedly actionable statements by Suntech after King became CEO, King argues plaintiffs' conclusory allegations of his involvement in the day-to-day operations of Suntech are insufficient to show control. According to plaintiffs, King "regularly discussed" Suntech's investment in GSF during investor conference calls. (CAC ¶ 31.) The sole example offered by plaintiffs was King's statement on the July 30, 2012 conference call admitting Suntech was not told that GSF Capital owned the bonds they claim to have pledged and conceding that Suntech was informed in 2010 that "GSF Capital... have [sic] borrowed the bonds from a registered company in

Europe." (CAC ¶ 116.) While plaintiffs offer this statement to show that Suntech knew GSF Capital held only a possessory interest in the purported backstop collateral, they present no facts reflecting that the statement was false or explain how it demonstrates King's control over any actionable statements.

Plaintiffs also aver King made knowingly or recklessly false and misleading statements by signing a Sarbanes-Oxley certification which falsely certified the accuracy of Suntech's financial statements and sufficiency of Suntech's internal controls. (CAC ¶¶ 31, 108.) As noted above, standard Sarbanes-Oxley certifications, standing alone, are insufficient to show a 10(b) violation. Therefore, an assertion that King exercised control over such statements cannot sustain 20(a) liability. Plaintiffs further quote Suntech's 2011 20-F dislosure regarding GSF and the GSF Loan Guarantee, but suggest nothing more than that King signed the accompanying Sarbanes-Oxley certification. (CAC ¶ 110.) Plaintiffs do not allege that King exercised any role as to the remainder of the 20-F disclosure, which only Shi signed. Because plaintiffs fail to allege with particularity that King exercised control over any alleged 10(b) violations by Suntech, the Section 20(a) claim as to King must be dismissed, with leave to amend.

## V. CONCLUSION

The motion to dismiss is granted with leave to amend. Any amended complaint shall be filed within 30 days of the date of this order.

IT IS SO ORDERED.

Dated: December 26, 2013

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE