IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SCOTT BRUCE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>          Plaintiff,<br><br>     v.<br><br>SUNTECH POWER HOLDINGS CO. LTD. and ZHENGRONG SHI,<br><br>          Defendants.<br>_____/ | No. CV 12-04061 RS<br><br>**ORDER DENYING MOTION TO DISMISS** |

## I.     INTRODUCTION

This is the second motion to dismiss a securities fraud class action brought by shareholders of Suntech Power Holdings, a Chinese manufacturer of solar energy products. In December 2013, the consolidated amended class action complaint (CAC) was dismissed with leave to amend because plaintiffs failed to allege sufficient facts to support their claims under Sections 10(b) and 20(a) of the Exchange Act. In particular, the prior order held that plaintiffs failed to plead scienter, an essential element of their first claim. It also identified certain deficiencies in some of plaintiffs' allegations of falsity and loss causation, two other essential elements. The order further dismissed the Section 20(a) claim, which requires a predicate violation of the Exchange Act.

Plaintiffs' second amended complaint (SAC), which includes a host of new factual allegations, fares better. Unlike the prior complaint, plaintiffs' amended pleadings sufficiently aver that defendant Zhengrong Shi acted with scienter when making allegedly false statements during the class period. Also unlike the CAC, the SAC includes sufficient allegations to support the theory that at least some of Shi's statements regarding the fair valuation of Suntech were false when made. Because defendant Shi fails to identify a material defect in either of plaintiffs' claims, the motion is denied.

## II.   BACKGROUND

This securities fraud action commenced in August 2012 when plaintiff Scott Bruce filed a class action complaint against four defendants: Suntech Power Holdings, Dr. Zhengrong Shi (Suntech's CEO), David King (CFO), and Amy Yi Zhang (former CFO). The complaint was amended via stipulation in early 2013 following the appointment of lead class counsel. By the end of 2013, two of the four defendants were effectively out of the picture. Suntech had filed for bankruptcy in October 2013, resulting in an automatic stay under 11 U.S.C. § 362 of the claims against the company. Meanwhile, plaintiffs voluntarily dismissed their claims against Ms. Zhang. Accordingly, the first motion to dismiss only concerned plaintiffs' claims against individual defendants Zhengrong Shi and David King.[1] The SAC, unlike the CAC, omits King and Zhang as defendants; plaintiffs now contend only that Suntech and Shi are liable under the Exchange Act. In light of the bankruptcy stay, only one defendant—Shi—is implicated in the present motion.

Plaintiffs' claims arise from the rapid July 2012 decline of Suntech's share price following the company's disclosure that it may have been the victim of a fraud. Suntech is a Chinese solar energy company that designs, manufactures, and markets photovoltaic products used to provide electric power for commercial and residential customers around the globe. In 2008, Suntech formed the Global Solar Fund, S.C.A., Sicar ("GSF") to invest in private companies that own or develop solar energy projects. The fund was allegedly the brain child of Javier Romero, a former Suntech sales agent.

---

[1] Suntech also filed a motion to dismiss in July 2013, several months before its bankruptcy. In light of the bankruptcy stay, the December 2013 order did not address Suntech's motion.

Throughout the class period, Shi served as Suntech's CEO, founder, board chairman, and largest shareholder. He also was heavily involved with GSF and negotiated to have himself placed on the board of managers of Global Solar Fund Partners S.a.r.l. ("GP"), which functioned as the general partner of the GSF investment fund. As a "class B manager," Shi exercised authority over the strategic decisions that GP made on behalf of GSF. GP's day-to-day management, however, was entrusted to Romero.

In May 2010, Suntech entered into a €554 million guarantee of a loan granted by the China Development Bank (CDB) to GSF's largest investee company. As further security, Suntech was required to maintain approximately €30 million in a cash collateral account. Collectively, this Loan Guarantee represented the largest financial commitment Suntech had ever provided to a third party. To backstop its exposure under the guarantee, Suntech accepted a pledge of €560 in German government bonds from GSF Capital Pte Ltd (GSF Capital), the parent of GP, as security. In light of this pledge, Suntech stated publicly that the fair value of the Loan Guarantee liability was approximately €2 million. As investors later learned, however, the company's exposure was much higher.

On July 30, 2012, Suntech announced that it may have been the victim of fraud in connection with GSF Capital's pledge of German government bonds. Suntech's outside counsel found evidence that the documentation regarding GSF's bond pledge may have been fabricated, perhaps by Romero. According to a later statement by Shi, "Full investigation made it apparent that these bonds may never have existed and that GSF Capital and its principal may have committed fraud." (SAC ¶ 129).

The market did not take kindly to this revelation. Shares of Suntech declined $0.23 per share, or 14.65%, to close on July 30, 2012, at $1.34 per share, on unusually heavy volume.[2] The following day saw further declines as shares fell another $0.21, or 15.67%, to close at $1.13 per share. Suntech's convertible notes declined from $69.00 just prior to the disclosure to $45.00 at the close of trading on July 31, 2012, a drop of nearly 35%, on heavy volume. Suntech later clarified

---

[2] Suntech's shares were traded on the New York Stock Exchange. Its convertible notes were traded and reported on FINRA's Trade Reporting and Compliance Engine.

that the security interest pledged by GSF Capital did not in fact exist, that Suntech accordingly had been the victim of fraud, and that the company would therefore revise its valuation of its liability for the Loan Guarantee from €2 million to between $60 million and $80 million, with a corresponding reduction in net income.

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations" are not required, a complaint must include sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 US 544, 555, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Claims grounded in fraud are also subject to Rule 9(b), which provides: "In allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy that rule, a plaintiff must allege the "who, what, where, when, and how" of the charged misconduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. See *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *See Twombly*, 550 US at 555. "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 US at 555) ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not taken as true). In actions governed by the Private Securities Litigation Reform

Act ("PSLRA"), such as this one, these general standards are subject to further refinement, as discussed in more detail below.

## IV. DISCUSSION

Both claims against Shi were dismissed in the prior order. In the SAC, plaintiffs attempt to cure their pleadings by adding various factual averments, several of which are drawn from statements and submissions made by Suntech, Shi, and Romero in other court proceedings. After the fraud was exposed, Suntech initiated civil actions against Romero in Singapore and London. The SAC includes certain excerpts from those proceedings in an attempt to show that Shi was contemporaneously aware of various "red flags" and warning signs concerning Romero when Shi made the allegedly false statements challenged in this action. The new allegations also include, among other things, excerpts of internal Suntech correspondence.

A. <u>First Claim: Violation of Exchange Act § 10(b) and SEC Rule 10(b)</u>

Section 10(b) of the Exchange Act makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Pursuant to Section 10(b), the Securities and Exchange Commission promulgated Rule 10b-5, which provides, among other things, "It shall be unlawful for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(c).

To state a claim for securities fraud, a complaint must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (citations omitted). To survive a motion to dismiss, a complaint asserting claims under Section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Rule 9(b) and the PSLRA. *Zucco Partners v. Digimarc Corp.*, 552 F.3d

981, 990 (9th Cir. 2009). Three central elements of the claim are at issue here: scienter, falsity, and loss causation. Shi does not dispute that the remaining elements are adequately pled.

### *i.   Scienter*

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). To plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). In particular, the complaint must allege the defendant "made false or misleading statements either intentionally or with deliberate recklessness." *Daou*, 411 F.3d 1006, 1015 (9th Cir. 2005) (citing *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999)). "Reckless conduct may be defined as a highly unreasonable omission, involving . . . an extreme departure from the standards of ordinary care . . . that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012) (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990)). An actor is deliberately reckless if, for example, he "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000)). "Recklessly turning a 'blind eye' to impropriety is equally as culpable as [actual knowledge] under Rule 10b-5." *Verifone*, 704 F.3d at 708.

As detailed below in discussion of the "falsity" element, the SAC identifies two broad categories of allegedly false statements made by Shi: (a) falsifications of the Loan Guarantee's fair value on Suntech financial statements, and (b) misstatements regarding the existence of a backstop vis-à-vis the German bonds. At bottom, both categories of allegations focus on the fact that Suntech shareholders were given the impression that the company's exposure under the guarantee was much smaller than it really was. Plaintiffs argue that based on information Shi knew at the time, he was at least deliberately reckless in making the challenged statements.

The prior complaint failed to plead facts "giving rise to a strong inference" of scienter. *See* 15 U.S.C. § 78u–4(b)(2). The CAC alleged Shi and Suntech acted with deliberate recklessness in the face of numerous "red flags" regarding the Loan Guarantee, including:

- Romero's demonstrated dishonesty in other business matters, including falsely holding himself out as the "president" of Suntech Spain,
- GSF's failure to deliver the actual bonds to Suntech,
- that the existence of the bonds was not verified,
- documents indicating that GSF Capital had borrowed the bonds from a European company and did not own them outright,
- that GSF Capital or Romero would likely not have the personal capital to acquire €560 million in bonds,
- that GSF Capital had previously misrepresented the nature of its projects to obtain fast-track permits from Italian authorities, and
- that GSF's projects "did not make economic sense."

(CAC, ECF No. 56, ¶¶ 134-35). The prior order concluded that this was not enough, holding that not one of these red flags, "viewed individually or together, suffices to show defendants acted with 'deliberate recklessness.'" *See Bruce v. Suntech Power Holdings Co. Ltd.*, 2013 WL 6843610 at *6 (N.D. Cal. Dec. 26, 2013). While acknowledging that some of defendants' conduct was problematic, the order concluded the CAC rested "too heavily on the ultimate absence of the bonds to imply that any due diligence was insufficient—the type of 'fraud by hindsight' allegation rejected by *Tellabs*." *Id.* at *5 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)). The order explained that while the later-disclosed fraud and admitted irregularities "do suggest an absence of due diligence," it was equally plausible to infer that Suntech was the victim of fraud "despite its best efforts to verify the existence of the pledged security." *Id.* at *5.

Plaintiffs now contend the SAC, which includes some fifty paragraphs of new averments, makes clear that defendants had hardly undertaken their "best efforts" to ensure the soundness of the bond transaction. *See id.* In plaintiffs' view, the new allegations reveal that Shi received numerous indicators that serious problems were lurking in the transaction. The amended pleadings point to, among other things:

- Several December 2009 emails from Romero to Shi emphasizing that the Loan Guarantee collateral should be kept confidential from "the market" and from CDB, the Chinese bank that granted the loan. (SAC ¶¶ 54 and 57).

- Correspondence to Shi revealing that Suntech's Director of Investment declined to conduct detailed due diligence into GSF due to "sensitivity of information." (SAC ¶ 58). The Suntech board, apparently troubled by GSF's resistance to providing information, later resolved to condition its approval of the Loan Guarantee on management's completion of due diligence. (SAC ¶ 60). According to plaintiffs, the due diligence was never completed.[3]

- Various allegedly blatant errors and inconsistencies in various documents sent from Romero to Shi, Zhi, and other Suntech officers. (SAC ¶¶ 61, 64, 84-87).

According to plaintiffs, these occurrences far predated Shi's allegedly false statements, the earliest of which was made in August 2010.

The SAC also highlights various statements made by Suntech, Shi, and Romero in subsequent court proceedings. To be sure, many of these statements bear questionable relevance to establishing that Shi acted with scienter. Suntech asserted in the Singapore proceeding, for example, that certain aspects of the transaction with GSF were "inherently suspicious" and that even "basic research" would raise significant questions about Werner Richter, the British company that—according to Romero—was supposed to provide the bonds. (SAC ¶¶ 69, 73). Suntech also took the position in the Singapore case that Romero "acted suspiciously throughout the transaction and appeared reluctant to share information with Suntech." (SAC ¶ 75). These later "admissions," to the extent they can be construed as such, are of questionable relevance to Shi's individual state of mind at the time he made the alleged misrepresentations and omissions at issue here.

Certain other statements, however, undergird plaintiff's scienter theory. In a statement before the United Kingdom court, Romero claimed to have called Shi on February 20, 2012, and told the CEO that the German bonds had been unilaterally repossessed by Werner Richter. (SAC ¶ 100). If true, Romero's statement would demonstrate that some five months before publicly disclosing to shareholders the non-existence of the bonds, Shi knew, or at least had a powerful reason to believe, that Suntech's offer of collateral was not backstopped. Additionally, Shi made statements indicating he had grown "suspicious" of Romero due to Romero's allegedly evasive

---

[3] Shi refutes, as a factual matter, whether Suntech undertook the requisite due diligence. At this stage, however, the court must accept plaintiffs' allegations as true. *See Tellabs*, 551 U.S. at 322.

No. C 12-04061 RS
ORDER DENYING SECOND MOTION TO DISMISS

8

behavior during the class period.[4]  (SAC ¶¶ 95-99).  Despite his admitted suspicions, which apparently surfaced by early 2012, Shi continued to represent to shareholders that Suntech's exposure under the Loan Guarantee was backstopped by the German bonds.

Shi argues that, absent some sort of "corroboration," Romero's emails to Shi and statements in subsequent litigation "lack the reliability" required to support an inference of fraud.  (Motion, ECF No. 104, 15:21-22).  Given that so much of the SAC paints Romero as a patently untrustworthy fraudster, Shi contends the court cannot take Romero's statements into account when testing the sufficiency of the pleadings.  Shi relies on *In re Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810 (N.D. Cal. 2000), wherein the court remarked in apparent dicta that if a securities plaintiff's "sole basis for an allegation is a statement from a non-Plaintiff witness," the complaint must specify all facts on which the plaintiff bases his belief in the allegation.  *Id.* at 817.  In support, the court invoked 15 U.S.C. § 78u–4(b)(1) of the PSLRA, which provides more generally that "if an allegation regarding [a] statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."[5]  Because most of the plaintiffs' fraud averments in *Secure Computing* were not pled on personal knowledge, and because the complaint failed to allege any *basis* for the plaintiffs' belief in their allegations, the court concluded that the plaintiffs failed to meet their pleading obligations under the PSLRA.

Here, however, the SAC provides ample basis to support the averments that reference Romero's statements.  First, Romero's litigation remarks are excerpted from United Kingdom court records.  While this hardly establishes the *truth* of Romero's claim that he called Shi on February 20, 2012, it provides some factual basis for plaintiffs' belief that such a call took place.  Romero's

---

[4] These particular statements do not, contrary to Shi's argument, constitute the sort of impermissible "fraud by hindsight" allegations rejected in *Tellabs*.  Indeed, Shi speaks directly to his impressions of Romero's behavior at the time.  (*See* SAC ¶ 99) (Alleging that, according to Shi, "Romero's behavior caused me to become suspicious.")

[5] The court also relied on *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999), in which Ninth Circuit held that when alleged misrepresentations in private securities fraud actions are not plead on personal knowledge, such allegations must be accompanied by a statement, "in great detail, [of] *all* the relevant facts forming the basis of [the plaintiffs'] belief."  *Id.* at 985 (emphasis added).  The Ninth Circuit later suggested, however, that *Silicon Graphics* was abrogated by the Supreme Court's decision in *Tellabs. See Killinger*, 542 F.3d at 784 ("*Tellabs*… suggests that perhaps *Silicon Graphics*…[is] too demanding and focused too narrowly in dismissing vague, ambiguous, or general allegations [of scienter] outright.").

credibility may be far from airtight, but Shi goes too far to suggest Romero's litigation statements can be disregarded entirely. Second, keeping in mind that a finding of scienter hinges on the defendant's mental state, it is not necessary for plaintiffs to "corroborate" the factual assertions made in Romero's various emails. What matters is that, according to the well-pleaded SAC, Shi received the emails in the first place, allegedly putting him on notice of various "red flags" underlying the bond transaction.[6]

Under *Tellabs*, the relevant inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets the standard." *Tellabs*, 551 U.S. at 323 (emphasis in original). The SAC, unlike the CAC before it, surpasses this threshold. At a minimum, plaintiffs' allegations, if assumed to be true, establish that by February 20, 2012, Shi had every reason to suspect the Loan Guarantee was no longer backstopped. Nonetheless, Shi continued to represent that the bonds provided "security" for Suntech's exposure under the Loan Guarantee. (*See* SAC ¶¶ 121-125). Additionally, the new averments give rise to a strong inference that Shi acted with scienter long before February 2012. In emails sent in December 2009, Romero impressed upon Shi the importance of keeping the German bonds confidential from "the market" and from CDB. (SAC ¶¶ 54, 57). In another email, Zhi informed Shi that there would be no detailed due diligence into the German bond provider due to "sensitivity of information." (SAC ¶ 58). Although the parties dispute whether the requisite due diligence was ultimately performed after the December 2009 board meeting, the court must accept as true the SAC's allegation that Suntech failed to ask its outside counsel to confirm the existence of the bonds or verify the authenticity of the transaction documents. (SAC ¶ 74). Given Shi's close involvement in the bond transaction, his position in the company as CEO and board chairman, and the communications and problematic documents highlighted in the SAC's new averments, combined with those "red flags" already highlighted in the CAC, a strong inference can now be drawn that Shi acted with deliberate recklessness by making the challenged statements about the existence of the bonds and the degree of Suntech's exposure under the Loan Guarantee.

---

[6] Shi does not appear to dispute, at this early stage of the litigation, that he actually received the emails in question. Even if he did contest this averment, however, the court's obligation at this juncture is to "accept all factual allegations in the complaint as true." *See VeriFone*, 704 F.3d at 701 (citing *Tellabs*, 551 U.S. at 322).

Shi argues plaintiffs' allegations of scienter are plainly incompatible with his status as founder and largest shareholder of Suntech. As the owner of nearly one third of Suntech's shares, Shi stood to lose a substantial portion of his investment if Suntech was called upon to satisfy its obligation on the guarantee without any collateral to backstop that obligation. "To credit any inference of fraud in these circumstances," defendant contends, "the Court would have to assume that Dr. Shi was economically irrational—an assumption that is contrary to the plaintiffs' allegations that he was an experienced, sophisticated and successful businessman." (Motion, ECF No. 104, 3:3-6). This argument assumes too much. For plaintiffs' fraud claim to go forward, the SAC need not allege that Shi had some pecuniary motive for making the challenged statements. *See Tellabs*, 551 U.S. at 325 (although personal financial gain can "weigh heavily" in favor of a scienter inference, the "absence of a motive allegation is not fatal"). Even so, the SAC endeavors to explain some of Shi's behavior. For example, the SAC alleges Shi understood that if CDB discovered the truth about the Loan Guarantee, the bank might pull its financing or demand a higher rate altogether. It further avers that if Suntech's auditors discovered the bonds did not exist, they would "force Suntech to recognize the fair value of the liability on its balance sheet." (SAC ¶ 90). More generally, plaintiffs argue a cogent inference can be drawn that Shi simply believed the misrepresented risks would not come to fruition. Although Shi ultimately discovered the truth and came clean with shareholders in late July 2012, the SAC raises a compelling inference that he waited too long to do so and made deliberately reckless statements in the interim.[7]

A claim arising under Section 10(b) will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Unlike the CAC before it, the SAC raises an inference of

---

[7] At oral argument, Shi argued that no strong inference of scienter can be gleaned from the five-month delay between the Romero phone call and the company's July 2012 disclosure. To Shi, a more compelling inference is that the phone call prompted an internal investigation culminating in the company's July 2012 disclosure that the loan guarantee was not backstopped. Counsel for plaintiffs countered that given how easy it would be to verify the non-existence of the collateral, a months-long internal investigation would not have been necessary. Whether and to what extent an internal investigation occurred, and what such an investigation revealed, are not issues to be decided at this phase.

scienter at least as compelling as any opposing, non-fraudulent inference. Plaintiffs' allegations, accordingly, satisfy the scienter requirement of their Section 10(b) claim.[8]

        *ii.        Material Misrepresentation or Omission (Falsity)*

A false or misleading statement is an essential element of any claim for securities fraud. *See Stoneridge Investment Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). Under the PSLRA, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . state with particularity all facts on which that belief is formed." 15 U.S.C. 78u-4(b)(1). Plaintiffs allege Shi, while serving as Suntech CEO, made various material misrepresentations in the years preceding the July 2012 price drop. According to the SAC, these misrepresentations fall into two broad categories: (a) falsification of the Loan Guarantee's fair value on Suntech financial statements, and (b) misrepresentations regarding the existence of a backstop supposedly eliminating Suntech's exposure under the GSF Loan Guarantee.

The prior order concluded that, as a categorical matter, the entire first group of challenged statements was not actionable because the CAC lacked averments indicating the statements were false *when made*. 2013 WL 6843610 at *3. The SAC remedies this defect. Although Shi casts his valuation statements as mere "opinions," arguing he believed the truth of the assertions at the time they were made, statements of belief are not categorically excluded from Section 10(b) liability:

> A statement of belief is a "factual" misstatement actionable under Section 10(b) if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy.

*Reese*, 747 F.3d at 579. Plaintiffs argue Shi's statements are actionable under the second and third avenues described in *Reese*. For purposes of resolving this motion, it is sufficient to conclude that at the time Shi made at least some of the challenged statements, he was "aware of undisclosed facts tending seriously to undermine" their accuracy. *See id.* For example, in a Form 20-F filed on April 27, 2012—more than two months after Romero's alleged phone call to Shi—the company claimed

---

[8] Because the SAC raises a strong inference of scienter under the holistic *Tellabs* standard, there is no need to address plaintiffs' additional arguments that their complaint satisfies the "actual access" standard, *see S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008), or the *Berson* "absurdity" test. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008). Nor

1  that the fair value of the debt guarantee was approximately €2 million.[9] (SAC ¶ 124). Similarly, in
2  press releases and related Form 6-Ks filed in March, April, and May 2012, Shi allegedly made
3  similar assurances.[10] (SAC ¶¶ 120-123, 126). It thus cannot be said that, as a *categorical* matter,
4  none of Shi's statements regarding the value of the Loan Guarantee are actionable.[11]

5  Shi also argues he cannot be liable under Rule 10(b) for general statements made in Suntech
6  press releases. Although numerous of the releases *quote* Dr. Shi, plaintiffs do not challenge any of
7  Shi's specific comments as being false. Instead, plaintiffs allege that Shi "possessed the power and
8  authority to control" the company's press releases, and thus that he was responsible for various
9  *other* statements made in the same releases that also quote him. (SAC ¶ 26). This, Shi contends, is
10 simply not enough for falsity under the PSLRA. To be sure, "[a] defendant can be held liable under
11 § 10(b) for a false or misleading statement only if the defendant 'made' the statement." *City of*
12 *Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1070 (N.D. Cal. 2012). The
13 plaintiff in *Juniper* sued a corporate board chairman under Section 10(b), claiming the individual
14 defendant had "ultimate authority" over various public statements made on behalf of the company
15 by its CEO and CFO. *Id.* at 1071. The court dismissed the claim, finding an insufficient causal
16 chain between the challenged statements and the plaintiff's "conclusory" assertion that the board
17 chairman was "one of" the persons at the company with the "ultimate authority" over public
18 statements. *Id.* at 1071.

19 As compared to *Juniper*, this case presents a stronger basis for attributing corporate public
20 statements to an individual defendant.[12] First, Shi was the chairman *and* CEO of Suntech at the time

---

[9] Because Shi signed the company's 2010 and 2011 20-F filings, it is fair to assume he signed Suntech's 2012 form, too, although the SAC makes no such explicit averment. (*See* SAC ¶¶ 113, 147). Although Shi disputes whether he can be liable for general statements made in Suntech press releases, he does not disclaim involvement in the company's 2012 20-F.

[10] As explained below, the allegations in the SAC are sufficient to support plaintiffs' contention that Shi was individually responsible for these particular statements.

[11] At this juncture, it is not necessary to parse out which of Shi's many statements are individually actionable.

[12] The prior order relied on *Juniper* to conclude that King, Suntech's CFO, cannot be liable for any statements he did not make. 2013 WL 6843610 at *4. The order did not discuss the issue presented here: whether Shi, who had significantly more influence in the organization, can be liable for general statements made in Suntech press releases.

these statements were made, thereby allowing a stronger inference that he had "ultimate authority" over the content of the company's press releases. *Id.* at 1071. Also, unlike in *Juniper*, plaintiffs here do not seek to hold the individual defendant liable for statements made by *other* specific persons. In *Juniper*, the board chairman was being sued for false public statements made by the company's CFO and CEO. Here, Shi—Suntech's CEO *and* board chairman—is being sued for general statements made in company press releases. Plaintiffs further argue that Shi's involvement with each press release, including his being quoted in each, "strongly suggests that Shi reviewed and approved the[ir] contents." (ECF No. 108, 10:5-6). In addition, the SAC generally avers that Shi micromanaged Suntech's affairs—an allegation that, if true, bolsters the plausibility of the inference that Shi would have reviewed and approved the press releases in which he is quoted.

At some later stage, the parties can litigate the factual questions surrounding Shi's involvement in the challenged press releases. For now, however, the SAC pleads sufficient facts to support plaintiffs' claim that Shi is individually liable for such statements.

    *iii. Loss Causation*

In their prior complaint, plaintiffs claimed to have suffered economic loss due to Suntech's failure to disclose until July 30, 2012 that the bonds were borrowed from a third party. The prior order concluded, however, that "the only economic loss alleged by plaintiffs is most plausibly attributed to defendants' disclosure that the bonds *did not exist*," not to the company's simultaneous disclosure that the bonds were purportedly borrowed from a third party. 2013 WL 6843610 at *8 (emphasis added). Although the SAC continues to allege Shi misrepresented the origin of the bonds, plaintiffs concede these misrepresentations caused no losses. (Pl. Opp., ECF No. 108, 6 n. 5). Instead, plaintiffs contend Shi's willingness to misrepresent the ownership of the bonds is evidence of scienter generally. In any event, it is evident from the parties' submissions that this element is no longer in dispute. Although the bond ownership misrepresentations did not cause economic loss, Shi does not dispute that his *other* challenged statements satisfy loss causation.

In sum, defendant's second motion fails to identify any fatal flaw in plaintiffs' claim under Section 10(b). Accordingly, the motion is denied with respect to the first claim.

B.  Second Claim: Violation of Exchange Act Section 20(a)

To state a claim under Section 20(a) of the Exchange Act, a plaintiff must allege a predicate violation of Section 10(b).  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).  In moving to dismiss plaintiffs' second claim, Shi argues only that the SAC fails to allege a primary claim under Section 10(b).  Because plaintiffs' first claim survives, their second claim must also.  The motion is therefore denied with respect to this claim.

V.   CONCLUSION

For the foregoing reasons, defendant's motion is denied.  Defendant shall file an answer to the SAC within twenty days of the date of this order.

IT IS SO ORDERED.

Dated: 8/12/14

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE